[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15907

_____

D. C. Docket No. 4:10-cv-00023-RLV

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY,

Plaintiff-Appellee,

versus

TYLER C. MCCAIN,
TYLER C. MCCAIN, P.C.,
d.b.a. The McCain Law Firm,

Defendants-Cross Defendants-
Cross Claimants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 22, 2013)

Before PRYOR and BLACK, Circuit Judges, and RESTANI,[*] Judge.

PER CURIAM:

_____
[*] The Honorable Jane A. Restani, United States Court of International Trade Judge,
sitting by designation.

In this case, Tyler C. McCain, P.C., d/b/a The McCain Law Firm, (the McCain Firm) and its principal, Tyler McCain (collectively, the McCain Defendants), appeal the district court's grant of summary judgment to Old Republic National Title Insurance Company (Old Republic) on its claim of fraud. The parties have fully briefed the issues presented by this appeal, and we have held oral argument.   The parties are aware of the underlying facts, which we will briefly summarize.

## I.    BACKGROUND

Prior to the events giving rise to this action, Old Republic had appointed the McCain Firm as a policy-issuing agent in connection with its title insurance business.  Subsequently, in March 2001, McCain became involved in the financing of a feature film through his representation of Clarence King and Wade Thomas. The film was to be produced by Martin Poll, who had procured a $10 million commitment from Azimut Investments, Limited[1] (Azimut) contingent on Poll's ability to independently raise the additional $60 million necessary to produce the film.  The parties intended King and Thomas to raise the additional funds.

To facilitate King and Thomas's efforts, the parties intended Azimut to deposit the $10 million into escrow to be held until such time as it could be transferred to Poll along with the additional $60 million or, failing that, returned to

---

[1] Azimut was controlled by Ayed al Jeaid, a Saudi Arabian General.

2

Azimut. The parties agreed that McCain could serve as the escrow agent, but Azimut required assurance of the safe handling of its deposit. To this end, McCain contacted Jane McHenry, a senior employee with Old Republic, who provided letters stating McCain was Old Republic's authorized agent and Old Republic would indemnify any loss Azimut incurred due to a breach of the escrow agreement up to $10 million.[2] Satisfied, Azimut and the other parties (or their associated entities) entered into the first escrow agreement in March 2001. Pursuant to the parties' objectives described above, the escrow agreement required Azimut to deposit $10 million into an escrow account on which the McCain Firm was to be the sole signatory. The agreement further provided the McCain Firm would disburse the funds to Poll only when accompanied by an additional $60 million. If the additional funds were not raised within 45 days of Azimut's deposit, the original $10 million would be returned to Azimut with interest. The

---

[2] McHenry initially sent Azimut a "closing protection letter" on February 28, 2001, with references to real-estate closings, which caused Azimut to be uncertain whether McHenry understood the true nature of the transaction. Azimut voiced these concerns, and in response, McHenry prepared a second letter dated March 15, 2001, that stated in its entirety as follows:

> This letter will serve as confirmation that the McCain Lawfirm is an authorized agent of Old Republic Title Insurance Company, and is insured to act in the capacity of Escrow Agent in accordance with the terms outlined in the Escrow Agreement attached to this letter as Exhibit "A".

A third letter sent on the same day added an additional sentence: "In the event Escrow Agent defaults in regard to the Escrow Agreement, Old Republic Title shall indemnify Azimut up to $10,000,000.00."

McHenry sent additional letters on June 27, July 30, and August 9, 2001, that reaffirmed that Old Republic continued to insure Azimut's $10 million deposit as the escrow agreement was modified and extended.

3

escrow agreement prohibited any other transfers of the $10 million unless expressly authorized in writing by Azimut.

King and Thomas proved unable to raise the additional funds required to produce the film, and the parties began to consider alternative means of financing. McCain alleges that in July he spoke with General Ayed al Jeaid, Azimut's principal, who orally authorized McCain to transform the escrow agreement into a loan to Poll.  McCain alleges that Poll and an associate, Charlene Marant, believed they could use the $10 million to generate the additional funding for the film.  By the end of July 2001, McCain had transferred nearly all of the $10 million out of the escrow account in contravention of the escrow agreement.  Despite this fact, McCain prepared and asked McHenry to sign letters stating the funds continued to be held in escrow and the McCain Firm would transfer the funds pursuant to Azimut's instructions.

The only evidence in the record that McCain disclosed the alleged transformation of the escrow agreement to Old Republic are statements McCain made during his deposition regarding a conversation he allegedly had with McHenry on August 13, 2001, when he personally delivered an insurance premium check to her.  Specifically, when asked whether he told McHenry about the transformation, McCain stated, "I don't think we had any conversation about any of it other than just there was a check that I remitted and I told her that it had

4

closed, the loan had closed." Later, when asked whether McHenry ever asked whether the $10 million had been returned to Azimut, McCain stated, "No. . . . I did tell her that the Azimut investment, the escrow deal had closed, and remitted a check from the—basically remittance on the loan amount." For her part, McHenry stated she had no memory of a conversation when McCain delivered the premium check but stated McCain never told her the escrow agreement had been changed to a loan. She also said, "[A]t some point I spoke to [McCain], and we were assured that the fund had been—that the escrow was complete. When I got the check, it was—I thought the escrow was completed, that there was no further obligations."

Suffice it to say the parties were never able to raise the additional funds and, in the process of attempting to do so, Azimut's initial $10 million deposit was lost. Azimut sued Old Republic for indemnity and recovered approximately $7 million in a settlement. Old Republic then commenced the instant action.

## II.    DISCUSSION

### A. The District Court's Findings

The district court granted Old Republic's motion for summary judgment on its claim of fraud.[3] In its orders, the district court concluded the McCain

---

[3] For reasons known to the parties but irrelevant to our analysis, Old Republic voluntarily dismissed all of its claims other than fraud after the district court had granted its motion for partial summary judgment as to liability on October 17, 2011. After Old Republic dropped its other claims, the district court entered a second order October 11, 2012, granting Old Republic's "recast second motion for summary judgment" in which the court reaffirmed its earlier findings as to liability and granted judgment on damages as well. Although the McCain Defendants

Defendants had committed fraud as a matter of law by concealing and suppressing material facts regarding the Azimut transaction—facts the McCain Defendants were obligated to disclose as Old Republic's agent. Specifically, the district court found the McCain Defendants had changed the material terms of the escrow agreement without informing Old Republic, noting the McCain Defendants "admit[ted] that they did so."

In the second order granting summary judgment, the district court addressed the McCain Defendants' argument that the court had improperly discredited certain evidence in its prior order. In particular, the McCain Defendants relied on McCain's deposition testimony in which he stated he told McHenry about the transformation of the escrow agreement into a loan to argue a genuinely disputed material fact existed as to whether the McCain Defendants failed to make the required disclosures. The McCain Defendants also argued Old Republic failed to establish scienter as a matter of law because McCain believed he had no further responsibilities regarding the $10 million once the escrow had been converted to a loan up until the time the additional $60 million was raised.

In resolving the McCain Defendants' arguments, the district court first pointed out additional material omissions in an August 9, 2001 letter that provided an independent basis to find the McCain Defendants had committed fraud as a

appeal the latter order specifically, our analysis draws on the district court's reasoning in both.

6

matter of law.  The district court then concluded there was no genuine dispute the McCain Defendants had failed to inform Old Republic of the material changes to the escrow account and to McCain's duties thereunder.  Because a confidential relationship existed between the McCain Defendants and Old Republic, this failure constituted fraud.  Accordingly, the district court reaffirmed its prior findings and entered judgment in Old Republic's favor.

## B. Standard of Review

We review the district court's grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in the light most favorable to the non-moving party.  *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1211 (11th Cir. 2010).

## C. Analysis

The McCain Defendants raise three issues on appeal: (1) whether the district court erred by discrediting McCain's testimony that he told McHenry about the transformation of the escrow agreement into a loan; (2) whether the district court erred by concluding the McCain Defendants possessed the scienter required for fraud as a matter of law; and (3) whether the district court erred by finding that Old Republic exercised due diligence so as to allow a finding of justifiable reliance as a matter of law.

7

*1. Whether the district court erred by finding McCain failed to disclose the transformation of the escrow account to Old Republic*

The district court did not err in concluding McCain failed to disclose the transformation of the escrow account to Old Republic. McCain's alleged disclosure—i.e., "the loan had closed"—was insufficient to convey all of the material facts regarding the transformation of the escrow agreement into a loan, particularly a loan for which Old Republic would essentially be a guarantor. While the district court did not expressly reconcile this statement with its finding that the McCain Defendants admitted to changing the terms of the escrow agreement without informing Old Republic, the district court's finding was justified given the McCain Defendants alleged only a disclosure insufficient to satisfy their duties as Old Republic's agent. *See Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 507 S.E.2d 411, 414 n.14 (Ga. 1998) ("In cases of [a] confidential relationship, silence when one should speak, or failure to disclose what ought to be disclosed, is 'as much a fraud in law as an actual affirmative false representation.'" (quoting *Brown v. Brown*, 75 S.E.2d 13, 17 (Ga. 1953))).

McCain variously stated he told McHenry that "the escrow deal had closed," "the loan had closed," and the "transaction had closed." None of these statements—whichever was actually made—were full disclosures that reliably conveyed all of the material facts, particularly in light of McCain's admission that he and McHenry did not "have any conversation about any of it other than just

8

there was a check that I remitted[,] and I told her that it had closed, the loan had closed." By making these statements, McCain would not have disclosed the escrowed funds were now being loaned to Poll without any restrictions and that Old Republic would still be on the line to indemnify any losses resulting from the loan. McHenry's impression when she received the premium check from McCain—i.e., the escrow agreement had come to completion and Old Republic would have no continuing responsibility to Azimut—is entirely consistent with McCain's alleged disclosures and demonstrates their inadequacy. Accordingly, the district court did not err in concluding McCain had admitted to failing to disclose the material changes to the escrow agreement to Old Republic.

Moreover, although the district court focused on this particular act of fraud, the record discloses many others that independently justify the same conclusion. The district court mentioned the August 9, 2001 letter that McCain prepared and asked McHenry to sign. That letter stated the McCain Firm would "transfer funds as designed by Azimut investments" despite the fact the same funds had already been removed from the escrow account and released to Poll in contravention of the escrow agreement. The letter of August 9 followed a letter dated July 30, also prepared by McCain and signed by McHenry, stating "the escrowed funds [were] currently being held by Citibank, N.A.," the location of the escrow account, even though they had already been disbursed. Even if McCain disclosed the loan on

9

August 13, 2001, he did not disclose that the statements in these earlier letters regarding the location and security of the escrow funds were false. In addition to all of this, McCain also failed to disclose to Old Republic the details of the transfers. These details were material facts given Old Republic's continuing obligation to ensure the money was returned to Azimut or transferred to Poll if the additional $60 million were raised. In short, the McCain Defendants committed ample omissions to justify the district court's conclusions. We reject the McCain Defendants' contention the transfers out of escrow were "obvious"—despite the contrary statements in the letters they prepared—in light of the transformation of the escrow agreement into a loan. Likewise, we reject the argument that the details of the transfers were immaterial as mere "details of the loan" when, as in the instant case, a continuing duty existed to indemnify any loss of the funds. The McCain Defendants' other arguments excusing these omissions are equally without merit.

2. *Whether the district court erred in finding as a matter of law the McCain Defendants possessed the requisite scienter to commit fraud*

Scienter can properly be inferred from McCain's numerous fraudulent misrepresentations and omissions, described above. *See Crown Ford, Inc. v. Crawford*, 473 S.E.2d 554, 557-58 (Ga. App. Ct. 1996). McCain has offered no facts warranting a contrary inference so as to create a genuine question of fact. McCain's allegation that General Ayed al Jeaid orally authorized him to transfer

10

the escrowed funds to Poll does not undermine a finding of scienter because the relevant misrepresentations are his failures to inform Old Republic, not Azimut. Even if McCain could not have intended to deceive Azimut, there has been no suggestion McCain ever made Old Republic aware of his conversations with Azimut or any of the other parties to the escrow agreement. The undisputed record therefore strongly supports an inference of the McCain Defendants' intent to deceive Old Republic, and this inference justifies a finding of scienter as a matter of law.

3. *Whether the district court erred by finding as a matter of law that Old Republic fulfilled its duty of due diligence*

Under Georgia law, a fraud claim requires a plaintiff to show justifiable reliance. *Cox v. Bank of Am., N.A.*, 742 S.E.2d 147, 148 (Ga. Ct. App. 2013). "Where a confidential relationship exists, a plaintiff does not have to exercise the degree of care to discover fraud that would otherwise be required, and a defendant is under a heightened duty to reveal fraud where it is known to exist." *Hunter*, 507 S.E.2d at 414.

All of the parties agree a confidential relationship existed between the McCain Defendants and Old Republic. In light of this and the fact the escrow agreement required the McCain Firm be the sole signatory on the escrow account, Old Republic was entirely justified in relying on McCain to keep it informed regarding the status of the account. Simply put, McCain was uniquely positioned

11

to monitor and safeguard the escrow funds.  Any argument that McHenry should have somehow become a signatory on the account in contravention of the escrow agreement is meritless and warrants no further discussion.

## III.    CONCLUSION

In light of the foregoing, we conclude the district court committed no error with regard to any of the issues raised in this appeal.

**AFFIRMED.**